UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KEVIN EUGENE GILLISPIE,

                Plaintiff,

      v.                              Case No. 16-cv-1592-pp

CORRECT CARE SOLUTIONS, *et al.*,

                Defendants.

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 73, 86) AND DISMISSING CASE

The plaintiff alleges that the staff at the Brown County Jail routinely provided him with expired insulin and failed to diagnose and treat various skin infections he suffered, including one requiring hospitalization. In a screening order, the court allowed the plaintiff to proceed on deliberate indifference claims against Dr. Fatoki, Lt. Stephens and Officer Bolton, dkt. no. 13 at 6, as well as official-policy claims against Brown County Sheriff John Gossage, and Correct Care Solutions, the jail's contracted healthcare provider, id. at 7-8. The court later granted the plaintiff's motion to substitute Jail Administrator Larry Malcomsen and Nurse Emily Blozinski for Doe defendants originally named by the plaintiff. Dkt. No. 33. The defendants filed motions for summary judgment. Dkt. Nos. 73, 86. The court will grant both motions and will dismiss the case.

## I.    FACTS

The plaintiff's deliberate indifference claims arise out of a nine-month period he spent incarcerated at the Brown County Jail in 2016. Soon after being admitted to the jail, the plaintiff reported a foreign object in his eye. Dkt. No. 89 at ¶2. On March 24, 2016, Nurse Emily Blozinski, an employee of medical contractor Correct Care Solutions LLC, removed the object using a Q-tip. Id. At that same March 24 visit, the plaintiff complained of a rash on his body, and Blozinski examined him and reported that she would check with Dr. Fatoki about his symptoms. Id. at ¶3. She also asked that the plaintiff be provided with a new uniform, towel and blankets. Id. The nurse consulted with Fatoki the same day; he prescribed Ivermectin, an anti-parasite medication, and treatment notes indicate a prescription of six 3-mg tablets beginning the following day. Id. at ¶4; Dkt. No. 88-2 at 2. Blozinski also "educated patient on medication and treatment of scabies." Dkt. No. 88-2 at 2. Two days later, the plaintiff filed a medical complaint indicating that his wool blanket was causing a rash and that his insulin pen was almost empty. Dkt. No. 88-3 at 2. The same-day response from an officer whose signature is illegible indicates that the plaintiff should have expected to continue to itch from the scabies for a few days, "or even a week or two." Id.  The response also indicated, "we will send another insulin pen." Id.

Two weeks later, the plaintiff submitted another complaint indicating that his blanket was continuing to cause a rash and that he had developed a

2

large lump on his torso; an HSU appointment was scheduled. Dkt. No. 88-4 at 2. At an April 14 appointment, Fatoki drained a scrotal abscess, finding "copious purulent/bloody material." Dkt. No. 88-6 at 2. Medical notes indicated no history of wool allergy, as the plaintiff was alleging, but the doctor instructed the plaintiff to keep track of interactions with wool in order "to document evidence of allergy." Id.

On May 25, the plaintiff again complained of a "skin reaction to the wool blankets." Dkt. No. 88-9 at 2. His complaint noted that he had been very "patient but nothing [was] being done about this problem." Id. The jail's response indicates that the plaintiff had been seen by HSU but that there was "no rash present @ time of appointment. Next available appointment w/ HSU regarding rash from wool blanket." Dkt. No. 88-9 at 2.

On June 2, the plaintiff saw Fatoki complaining about a large lump on his neck. Dkt. No. 88-14 at 2. Fatoki's notes indicate the lump was likely due to MRSA, a type of bacteria: "His [previous] rash was treated with Ivermectin with some improvement. Worsened after he was transferred to Milwaukee on a writ. Will retreat with Ivermectin." Id. The treatment plan also included Bactrim, an oral antibiotic, and a recommendation to wash clothing and bedding in hot water. Id. at 3. On June 5, Blozinski treated the abscess, cleaned it and removed a hair from the wound on the advice of Fatoki. Dkt. No. 88-15 at 2.

On July 8, the plaintiff informed Blozinski that he had run out of the insulin pen tips he had brought with him from outside the jail. Dkt. No 88-16 at 2. She indicated that the jail would no longer provide pen tips but that the plaintiff could obtain them from someone outside the jail. Id. The plaintiff then filed a grievance about this, indicating that the insulin provided by the jail appeared cloudy, that his blood sugar was not dropping as expected and that some of the insulin had expired dates on the bottles. Dkt. No. 88-17 at 2. He also refused the nurse's suggestion that he withdraw insulin from his insulin pens with a syringe. Id. After two days, the plaintiff obtained insulin pen tips from a friend outside the jail. Id. at 4, Dkt. No. 95 at 3. In response to the plaintiff's grievance, Blozinski indicated that some types of insulin were not always clear and that expiration dates had been checked at the facility. Id. Although HSU had provided the plaintiff with a new prescription, it was cancelled because the plaintiff was once again using his own insulin pens and tips. Id.

By September 26 the plaintiff had run out of his pen tips and became reliant on jail-supplied insulin. Dkt. No. 95 at 3. He complained that his blood sugar levels were not dropping as they should. Dkt. No. 88-19. He observed that the date on the jail-provided insulin bottles read "7-8-2016," or roughly seven weeks earlier. (The date listed on the bottle is the date the insulin was first opened, after which the insulin may be used for 28 days.) The jail's response indicates that "new insulin was brought down to Charlie pod

yesterday. Thank you for making us aware of that issue." Id. The plaintiff agrees that "new insulins" were brought to the pod as a result of his complaint. Dkt. No. 95 at 3.

Two weeks later, Fatoki examined the plaintiff to address the plaintiff's complaint about recurrent skin infections. Dkt. No. 88-20 at 2. The treatment notes indicate that the plaintiff wanted to learn why he kept getting skin infections. "He does not have any skin lesions at this time. States he has had people look things up on the internet and he has been told there are different types of skin infections. Wants to know if he was treated with the right antibiotics." Id. Fatoki also noted that the plaintiff was "very argumentative" and questioned how the doctor could know how to treat the infections without testing the skin. Id. at 3. Fatoki indicated that the plaintiff did not have any skin lesions at the time of the visit; he also noted that the plaintiff's blood sugar was better controlled but that he would restrict concentrated sweets in the plaintiff's diet because the levels were still "elevated." Id.

On October 17, the plaintiff again complained that he had found jail-supplied insulin with expired dates. Dkt. No. 88-21 at 2. "My pens were dated with a marker by the unit officer in Charlie pod the dates read 7-17-16 which makes them two months past expiration. Pens or bottles of insulin are suppose [sic] to be thrown out 28 days since taken out of refridgerator [sic] expired insulin is susceptible to degradation after its expiration date which contributes to my higher blood sugar levels and nerve damage." Id. The complaint notes

that the plaintiff had raised this issue several times before. Id. The response, from a Nurse Jones, indicates that "[y]ou are prescribed 25 units of Lantus[1] per evening. A lantus pen holds 300 units. You should be going through a pen every 12 days. Please use only your prescribed pens." Id. at 4. The defendants explain that this somewhat cryptic response meant that the plaintiff "had an adequate self-supply [of insulin] and should not require use of facility-supplied insulin." Dkt. No. 89 at ¶21. (As noted earlier, however, the plaintiff states that he was no longer using his own insulin by that date.) In any event, the plaintiff soon obtained new insulin after complaining to an officer named Dart, who "called hsu and [said] they would bring new insulin." Dkt. No. 95 at 4.

The next day, the plaintiff filed a grievance about the insulin. Dkt. No. 88-22 at 2. This time Jones determined the grievance to be "founded" and agreed with the plaintiff that "Insulins should be used no longer than 28 days after opening. Nursing should be and will be checking monthly to make sure that insulins don't expire. Just as you would at home, please continue to check insulin that you are using and be an active participant in your health." Id. at 4.

---

[1] According to its web site, Lantus® (insulin glargine injection) is "a long-acting insulin used to treat adults with type 2 diabetes . . ." https://www.lantus.com. The site references a "SoloStar® injection pen" which a person can use once a day, and which "lasts for 4 weeks outside the fridge."

The following day the plaintiff filled out a complaint indicating that he had "severe pain and numbness in [his] arm hands and feet. This is not getting any better I feel I need to go to a hospital." Dkt. No. 88-23 at 2. Fatoki saw the plaintiff about two weeks later, finding that the leg pain was indicative of neuropathy, while lesions on his hand suggested eczema. Dkt. No. 88-24 at 3. Fatoki prescribed hydrocortisone cream for the eczema and Meloxicam, which the plaintiff had used in the past with some success, for the pain. Id.

On November 9, the plaintiff transferred to Outagamie County Jail for a court hearing. Dkt. No. 80 at ¶3. On November 14, he complained of a "wound in left hand with drainage that he noticed yesterday but got worse overnight." Dkt. No. 81-1. The nurse obtained an order for Bactrim DS and acetaminophen. Id. The next day the plaintiff returned to Brown County Jail, where he filled out a medical request form indicating he had a "very bad infection" in his left hand stretching from his fingers to his forearm. Dkt. No 88-25 at 2. He also indicated nerve pain, shaking, vomiting, spasms, nausea and dizziness. Id. The response indicated that HSU staff were aware of the issue, that he had been prescribed antibiotics at Outagamie County Jail and the situation was being monitored. Id. A Nurse Denissen (not a defendant) saw him the same day, noting his hand was swollen and hot and that he had been prescribed Bactrim (the antibiotic) the previous day. Dkt. No. 88-26 at 2. The jail continued the Bactrim prescription. Dkt. No. 88-27 at 2; Dkt. No. 81-7.

On November 17, a Nurse Larson (not a defendant) saw the plaintiff and indicated that the plaintiff had returned from Outagamie County Jail with a "swollen hand." Dkt. No. 88-27 at 2. "Tonight his left arm is swollen, warm to the touch and has red streaks coming from his hand. He also complained of flu like symptoms and trouble breathing. His lungs were clear. . . . MD contacted and informed writer to send patient to ER." Id. That evening, the sheriff's department drove the plaintiff to the hospital. Dkt. No. 80-2 at 2.

Provider notes from the Aurora Bay Care Hospital indicate the following:

> Patient is a 52-year-old male who presents to the emergency department with law enforcement from Brown County Jail for evaluation of redness and swelling to his left hand. The patient states his symptoms began for [sic] 5 days ago, He was started on a course of Bactrim while in jail, He states he has been raking the Bactrim as prescribed, His symptoms have been progressively worsening. He states the redness and swelling has begun to spread and worsened. He now has a red line extending up the inside of his arm. He also complains of a lowgrade fever, chills, and flulike symptoms. He is an insulin-dependent diabetic. He has had pus draining from between his second and third fingers, He states he has had various abscesses on his abdomen, neck, head, and axilla previously.

Dkt. No. 81-2.

Hospital records show that the plaintiff "responded well" to treatment with an "excellent start to healing." Dkt. No. 95-2 at 1. The hospital discharged the plaintiff on November 21 with a prescription for oral antibiotics. Id. On November 25 the plaintiff filed another grievance about expired insulin. Dkt. No. 95-2 at 17. He stated that he had discovered the date on the bottle he was using had been changed from 10-7-16 to 11-15-16. Id. He alleged that "medical

staff is extending the dates" instead of disposing of the expired insulin. Id. The response, from Blozinski, denies this, indicating that staff exchanged insulin bottles on the "appropriate dates;" she further counseled the plaintiff that if he had concerns, he could supply his own insulin. Id. On December 7, the plaintiff raised the same issue in what he described as an "appeal," suggesting that Blozinski's treatment of his original grievance had failed to address the issue properly. Dkt. No. 95-2 at 19. The response, which appears to be signed by Jones, indicates that "Insulin is changed every month per protocol. As stated in past grievances, I have personally made sure that insulin is changed out every 28 days and it has been done so on schedule. The insulin that you are using is not expired." Id. at 20. A notation in the same record by a J. Lelinski explains that "[m]edication expiration date was changed to reflect the medication was not expired, [although] the expiration date on bottle reflected it was. This was changed on 3rd shift by HSU last night." Id. Although somewhat opaque, apparently the defendants' position is that they were re-using insulin bottles (with expired dates) to supply new (unexpired) insulin, and on at least one occasion they supplied the plaintiff with a bottle having both October and November 2016 dates on it.

## II.     MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 73, 86)

### A.     Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317,

324 (1986). "Material facts" are those under the applicable substantive law that

"might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute

over a "material fact" is "genuine" if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed

must support the assertion by:

> (A) citing to particular parts of materials in the record,
> including depositions, documents, electronically stored
> information, affidavits or declarations, stipulations (including
> those made for purposes of the motion only), admissions,
> interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the
> absence or presence of a genuine dispute, or that an adverse
> party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or

oppose a motion must be made on personal knowledge, set out facts

that would be admissible in evidence, and show that the affiant or

declarant is competent to testify on the matters stated." Fed. R. Civ. P.

56(c)(4).

B.      The Plaintiff's Claims Regarding Expired Insulin

The court allowed the plaintiff to proceed on his Eighth Amendment

claim about the expired insulin as to Blozinski and Fatoki. Dkt. Nos. 13 at 6,

10

33 at 1.[2] The court also allowed the plaintiff to proceed on an "official capacity" claim that the jail (through Sheriff John Gossage and Jail Administrator Larry Malcomsen) and Correct Care Solutions had been supplying expired insulin to inmates for eight months or so. Dkt. No. 13 at 7-8.

"The Eighth Amendment safeguards the prisoner against a lack of medical care that may result in pain and suffering which no one suggests would serve any penological purpose." Arnett v. Webster, 658 F.3d 742, 750 (7th Cir. 2011) (quoting Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 828 (7th Cir. 2009)). "Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs." Arnett, 658 F.3d at 750 (citing Estelle v. Gamble, 4289 U.S. 97, 103 (1976)). "[A] claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition." Arnett, 658 F.3d at 750 (citations omitted). "Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." Rodriguez, 577 F.3d at 828 (quoting Estelle, 429 U.S. at 103). To be liable, an official must be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and the official "must also draw the inference." Higgins v. Corr. Med.

---

[2] The plaintiff also had alleged that a Jane Doe Nurse and a John Doe Nurse were involved in the insulin claim, but he later asked the court to dismiss those defendants, and the court granted that request. Dkt. No. 33 at 1-2.

<u>Servs. of Ill., Inc.</u>, 178 F.3d 508, 511 (7th Cir. 1999) (quoting <u>Farmer v.</u>
<u>Brennan</u>, 511 U.S. 825, 837 (1994)).

Defendants Blozinski, Correct Care Solutions and Fatoki—the medical defendants—filed their proposed findings of fact on December 17, 2018, along with their summary judgment motion and brief. Dkt. No. 89. One of those proposed findings states, "There is no evidence that Mr. Gillispie actually injected the expired medication or that it had a harmful effect on his health, and he does not allege that he suffered a physical injury as the result of some of the insulin bottles in the Jail's supply being expired." <u>Id.</u> at ¶25.

While the plaintiff filed his own proposed findings of fact, dkt. no. 95, he did not respond to the *defendants'* proposed findings of fact. This court's Civil Local Rule 56(b)(2)(B) requires a party opposing a motion for summary judgment to file "a concise response to the moving party's statement of facts" that must reproduce each paragraph of the moving party's statement of facts, followed by a response. When the defendants filed their motion for summary judgment on December 17, 2018, they attached—as the court's rules require them to do—a copy of Civil L.R. 56 for the plaintiff's benefit. Dkt. No. 86 at 4-5.

When a plaintiff fails to dispute the defendant's proposed facts, those facts are deemed admitted for the purpose of deciding summary judgment. Civ. L. R. 56(b)(4); <u>Brown v. Chybowski</u>, No. 14-cv-1066-PP, 2016 WL 3034180, at *1 n.1 (E.D. Wis. May 27, 2016); <u>Sherman v. Walmart</u>, No. 17-cv-1446, 2019 WL 2140653, at *1 (E.D. Wis. May 16, 2019) (enforcing Civil L.R. 56(b)(4)

12

against *pro se* party). The reason for rules like Rule 56(b)(4) is that "neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." <u>Greer v. Bd. of Educ</u>. 267 F.3d 723, 727 (7th Cir. 2001). Cases like this one, with a very extensive and detailed record, are the reason courts create rules requiring proposed factual findings and responses to those findings. <u>Fabriko Acquisition Corp. v. Prokos</u>, 536 F.3d 605, 607 (7th Cir. 2008) (plaintiff "failed to respond to the defendants' proposed finding of facts as required under Civil Local Rule 56.2(b) of the Eastern District Court of Wisconsin, in that [plaintiff] responded only in undifferentiated narrative form, without identifying paragraphs and without specific citations to evidentiary materials in the record.") In this case, the plaintiff has not disputed the defendants' proposed finding that there is no evidence he injected expired medication, or that it harmed him, or that he suffered a physical injury as a result of receiving expired insulin. The court is *entitled* to deem those facts admitted.

The court, however, is not *required* to deem the medical defendants' facts admitted. It has the discretion to consider the plaintiff's own short, narrative, unsworn statement of facts. Dkt. No. 95. But the plaintiff's facts do not raise a genuine dispute of material fact about the expired insulin. The plaintiff's facts allege that the plaintiff noticed expired insulin on three occasions, and a changed date on a fourth occasion. Dkt. No. 95 at pp. 4-5. He says nothing about using the expired insulin. He says nothing about becoming ill due to

expired insulin. In the plaintiff's own version of events, and as evidenced by his multiple grievances, he paid close attention to the dates on insulin the jail provided him, frequently demanding new insulin if the date was expired. The plaintiff's proposed findings indicate that when he complained, "new insulins were brought to the pod," dkt. no. 95 at 3, and on one occasion an officer "called hsu and they would bring new insulin," dkt. no. 95 at 4. The jail medical records show that the HSU even thanked the plaintiff for bringing the issue of expired insulin to their attention. Dkt. No. 88-19 at 2. The plaintiff's statement of facts indicates that on September 26, less than a week after running out of his own insulin, the plaintiff noticed that "both insulins I was expected to use were expired for 2 months. I informed Hsu and new insulins were [brought] to the pod." Dkt. No. 95 at 3. It appears that even though the plaintiff thought the jail "expected" him "to use" expired insulin, he noticed that the insulin was expired, and obtained new insulin rather than using the expired batch. The plaintiff filed grievances about receiving expired insulin, but those grievances do not say that he used the expired insulin. Dkt. Nos. 88-17 at 2, 88-21 at 2, 88-22. The court agrees with the defendant that there is no evidence it can find in the record to show that the plaintiff used expired insulin or was injured by it.

In his brief in opposition to summary judgment, the plaintiff argues that the expired insulin "had caused him to obtain a staph infection which also led to various other medical issue which Gillispie had suffered with multiple flare

ups of boils, sores and infections that was all over his body." Dkt. No. 106 at 2. He argued that the expired insulin "caused him to suffer." Id. at 9. But "[a]rgument is not evidence upon which to base a denial of summary judgment. The nonmoving party, 'by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial.' Fed.R.Civ.P. 56(e)." Scherer v. Rockwell Int'l Corp., 975 F.2d 356, 361 (7th Cir. 1992). The plaintiff provides no evidence supporting these arguments, and his own statements indicate that, other than a two-day period in July when his pen tips ran out, the plaintiff was using his own insulin until September 20, 2016. Dkt. No. 95 at 3. The plaintiff's skin rashes and sores dated back to March 2016, before he began relying on insulin supplied by the jail. The plaintiff's argument that the expired insulin caused him to have issues with his skin also seems to contradict his claim that he had a rash due to a "skin reaction to the wool blankets." Dkt. No. 88-9 at 2.

Although the court does not have an independent obligation to sort through the record and make the plaintiff's best case for him, the evidence the court has reviewed reveals only two occasions on which the plaintiff either says he went without insulin because what he'd been provided was expired, or implies that he used expired insulin. The first occurred on July 8, after the plaintiff ran out of his pen tips, which temporarily had been supplied by the jail. Dkt. No. 88-17 at 2. In his grievance about that incident, the plaintiff stated that when he used the jail-supplied insulin, he noticed that his blood

sugar levels were "not coming down so much," so he started checking expiration dates. Id. He indicated that when "came to Charlie pod" he noticed that the bottles were cloudy and had been in a cabinet for three months without being checked or changed. Id. He concluded by stating that he had his insulin pens but no tips, the insulin in Charlie pod's cabinet was too old to use, and "it's going on 2 days without my Lantis insulin." Id. The plaintiff stated in his proposed findings of fact that on July 10, 2016—two days later—his friend got him some tips from Walmart and dropped them at the jail. Dkt. No. 95 at 3.

The second possible instance involves the plaintiff's assertion that on November 25 the plaintiff discovered that a bottle dated "11-15-16" also had the date "10-7-16" written on the bottom. Id. at 4. In the grievance he filed about this issue, the plaintiff alleged that he had been using that bottle since November 15, 2016, that the bottle was expired as of November 7, 2016 and that the HSU staff was "extending" the dates. Dkt. No. 95-2 at 17. The staff denied this, responding that the insulin was changed every month and that the "insulin bottles" were "exchanged on the appropriate date." Id. at 18, 20.

Even if the plaintiff went without insulin for two to four days as a result of the first incident, and the insulin he complained of in the second incident was expired, the court could not conclude that the plaintiff had raised genuine issues of material fact as to whether the defendants he sued were deliberately indifferent.

No reasonable jury could conclude that the incident in July constituted deliberate indifference. The plaintiff filed a grievance on July 8, saying that he was "going on two days" without insulin; at that point, the staff would have been aware that he was not using the insulin the jail had provided. But by July 10—two days later—his friend had dropped off more pen tips at the jail. Dkt. No. 95 at 3. The court is aware of, and takes seriously, the fact that untreated diabetes can cause harms that are not immediately discernible, but there is no evidence in the record that in that two days—even if the jail staff did nothing— the plaintiff suffered the kind of harm that would give rise to an Eighth Amendment violation. In McDermid v. Garza, No. 13-CV-03210-CBS, 2015 WL 1089863, at *5 (D. Colo. Mar. 9, 2015), the district court granted a motion to dismiss a complaint alleging ten instances in which the prisoner had been denied insulin treatment altogether. In dismissing the case, the court noted that there was no concrete allegation of a harm serious enough to give rise to an Eighth Amendment violation: "the issue here is whether the alleged periodic interruptions in [the plaintiff]'s insulin treatment resulted in substantial harm. A close reading of [the plaintiff]'s complaint shows that he has not alleged that—as a result of the interruptions in treatment—he suffered any injury that would constitute substantial harm." Id. (Citations omitted.) And in Benford v. Walker, No. CIV.A. H-10-0570, 2011 WL 1528467, at *3 (S.D. Tex. Apr. 19, 2011), the court noted that the prisoner's "denial of insulin medication was only temporary [four days] and he does not appear to have suffered any lasting

effects. Such an interruption or delay does not constitute deliberate indifference unless it resulted in substantial harm."

The same is true here. Assuming that going without insulin for two to four days could cause serious harm to the health of a diabetic, the record contains no evidence that it did so here.

As to the November 25 incident involving the two dates on the same bottle, the plaintiff has not alleged, and the record does not indicate, that either of the individual named defendants provided him with that insulin or changed the date. The court allowed the plaintiff to proceed on his Eighth Amendment claim about the expired insulin as to Blozinski and Fatoki. Dkt. Nos. 13 at 6, 33 at 1. The grievance response indicates that the date on the bottle was changed "on 3rd shift by HSU last night." Dkt. No. 95-2 at 20.

With regard to the plaintiff's "official capacity" claim that the jail was supplying expired insulin, the plaintiff has alleged that he noticed he'd received expired insulin on three or four occasions between July and mid-October, and that he noticed a changed date on a bottle on one occasion in November. A plaintiff trying to demonstrate an official capacity claim must show a widespread practice that is so permanent and well-settled that it constitutes a custom or practice. Estate of Sims *ex rel* Sims v. Cty. of Bureau, 506 F.3d 509, 515 (7th Cir. 2007); see Monell v. New York City Dept' of Soc. Servs., 436 U.S. 658, 692 (1978); see also Calhoun v. Ramsey, 408 F.3d 375, 379 (7th Cir. 2005). Four events over four months with one plaintiff does not demonstrate a

18

widespread practice so permanent and well-settled that it constitutes a custom or practice, especially when the staff responded when the plaintiff brought the issues to their attention and when, in the case of the changed date, staff indicated that they changed the date to make clear that the insulin was not expired.

Finally, in the complaint, the plaintiff alleged the following regarding the insulin issue:

> I am diagnosed with Type 2 diabetes and I am insulin dependent. My complication of diabetes is neuropathy. While receiving medical care from Correct Care Solutions at Brown County Jail the medical staff has constantly provided me with expired insulins. Medical staff knowing of the degradation of these insulins continued providing expired insulins after multiple warnings, complaints and grievances. Medical staff *and Brown County Jail staff* has continued deprivation and putting me at risk causing nerve damage and severe pain.

Dkt. No. 1 at 3. The court allowed the plaintiff to proceed against Blozinski and Fatoki on this claim but did not allow him to proceed against any non-medical jail staff. In his proposed findings of fact, the plaintiff made several references to officers in Fox Pod who brought him his insulin, and says that he informed two of them about the expired insulin. Dkt. No. 95 at 3-4. He did not name the officers.

In the plaintiff's June 25, 2019 declaration in opposition to the jail defendants' motion for summary judgment, the plaintiff averred—for the first time—that "Bolton" "disregarded the principles of his administrative duty's in which he swored to portect. The rights of Gillispie," dkt. no. 108 at ¶6, and that the plaintiff "had attempted to seek out staff assistance specifically Officer

19

Bolton who basicly turned a blind eye to the matter. Even after Gillispie had sown him the written crossed out date and written new date on the insulin bottle," id. at ¶9. He also asserted that the jail, the HSU, Fatoki "along with Defendant Bolton did infact violated Gillispie's constitutional rights in depriving him of the adequate medical treatment, and that defendant have [NOT] provided him with the Community Health Care Standards and Protocols that a State or County entity requires a County to provide." Id. at ¶17.

The first time the plaintiff asserted that *Bolton* was deliberately indifferent to the plaintiff's insulin issue, then, was over two and a half years after he filed his complaint, eight months after the close of discovery and over seven months after the jail defendants filed the their summary judgment motion. In their proposed findings of fact, the jail defendants stated that there was no one named "Officer Bolton" working at the jail in 2016. Dkt. No. 82 at ¶27. There *was* an Officer *Bowden*, but the defendants state that Bowden had no role in deciding which medications the plaintiff should receive and was not involved in evaluating the dosage or timing or appropriateness of an inmate's medication. Id. at ¶¶35-36. The defendants stated that if the plaintiff had complained to Bowden that his medications were expired or incorrect, Bowden would have contacted medical personnel about the issue. Id. at ¶39. See also Dkt. No. 76 (Bowden declaration).

There is no evidence to support the plaintiff's claims that "Officer Bolton" was deliberately indifferent to his insulin issues—there is not even any

evidence in the record that there was an Officer Bolton at the jail in 2016. If the plaintiff meant Officer *Bowden*, the plaintiff did not assert that he told Bowden about the expired insulin until months after the defendants filed their motion for summary judgment, and there is no evidence in the record to support his claim.

The only other "Brown County Jail staff" the plaintiff named in his claim was Lt. Stephens. It appears, although the jail defendants never say so directly, that the plaintiff probably meant Lt. *Steffen*, who in 2016 was the security lieutenant at the jail. Dkt. No. 79 at ¶1. Steffen attested that his only involvement with the plaintiff in 2016 was his response to an appeal that the plaintiff filed, dated October 27, 2016, regarding the plaintiff's diabetes medication. Id. at ¶4. Steffen said he reviewed the appeal, then contacted the jail medical personnel, who told him that the plaintiff's "current prescription with Lantus was valid and not out of date," and that an issue with another prescription had been corrected and was current. Id. at ¶6. Steffen says that he relayed this information to the plaintiff and told the plaintiff that the issue had been resolved. Id.

Steffen attached to his declaration a grievance summary report. Dkt. No. 79-1. That report indicates that on October 17, 2016 at 1:05, the plaintiff reported that he was "upset" that his "Humalog and Lantus insulin pens are expired," and indicated that the insulin should be thrown out after it has been out of the refrigerator for twenty-eight days. Id. The plaintiff had complained

that medical staff "continue to ignore an ongoing issue of expired insulin." Id.

The report indicates that a "J Jones" investigated, and on October 25, 2016,

responded, "You are prescribed 25 units of Lantus per evenings. A lantus pen

holds 300 units. You should be going through a pen every 12 days. Please use

only your prescribed pens." Id. Under the "Appeals" section, the report

indicates that the plaintiff appealed this finding on October 27, 2016. Id. The

response to the appeal, dated November 7, 2016, reads,

> I've spoken with HSU on this issue. Your current prescription with
> Lantus are valid and not out of date. HSU did correct an issue with
> Humulog and that is current as well. Grievance was founded in part
> and unfounded with Lantus issue. This has been remedied and is
> now closed. LT Steffen.

Id.

The plaintiff filed the appeal on October 27, 2016. Steffen consulted with

the medical staff, and responded eleven days later. Steffen—who is not a

medical professional—was entitled to rely on the judgments of the medical

professionals at the HSU. McGee v. Adams, 721 F.3d 474, 483 (7th Cir. 2013)

("non-medical professional defendants . . . [are] entitled to rely on the medical

professionals' determination . . . .") (citations omitted). "The only exception to

this rule is that nonmedical officers may be found deliberately indifferent if

'they have a reason to believe (or actual knowledge) that prison doctors or their

assistants are mistreating (or not treating) a prisoner.'" Id. (quoting King v.

Kramer, 680 F.3d 1013, 1018 (7th Cir. 2012), Hayes v. Snyder, 546 F.3d 516,

527 (7th Cir. 2008)).

22

No reasonable jury could find that Steffen was deliberately indifferent to the plaintiff's October 27, 2016 appeal of the finding that his issues with expired insulin had been addressed. The court will grant the defendants' motions for summary judgment regarding the plaintiff's claims of expired insulin.

C.    The Plaintiff's Claims Regarding His Hand Infection

As discussed above, the plaintiff's complaint named as defendants "Lieutenant Stephens" and "Officer Bolton," whom he identified as a "pod officer." Dkt. No. 1 at 2. It alleged that November 9, 2016 through November 17, 2016, he had notified "unit officers" of an infection in his left hand and arm, and that he was denied medical attention until November 17. Id. at 3. The court allowed the plaintiff to proceed on claims against unit officers Stephens and Bolton that they were deliberately indifferent to the severe infection in his left arm. Dkt. No. 13 at 6. Defendants Gossage, Malcomsen, *Steffen* and Bolton—the nonmedical defendants—filed their proposed findings of fact on December 7, 2018. Dkt. No. 82. As discussed above, they indicated that the jail did not employ an officer named "Bolton" during the time of the events the plaintiff described in the complaint. Id. at ¶27. They said that *Bowden* worked the night-time shift in 2016, and that in November 2016, he was assigned to a different pod than the one the plaintiff was in. Id. at ¶¶28-32. The defendants assert that Bowden never saw an injury or infection on the plaintiff's left hand or arm, and did not have any contact with the plaintiff in November 2016. Id.

The defendants argue that Steffen didn't have any contact with the plaintiff regarding the infection, and wasn't involved with that incident. Id. at ¶20. They say that Steffen's only involvement with the plaintiff in 2016 was his response to the October 27, 2016 appeal of the plaintiff's grievance regarding his diabetes medication. Id. at ¶21.

The plaintiff *did* respond to the nonmedical defendants' proposed findings of fact. Dkt. No. 107. Oddly, most of his response focuses on the expired insulin issue. The paragraph numbers in the plaintiff's response don't match up to the paragraph numbers in the jail defendant's proposed findings; the jail defendants had eighty-six proposed findings of fact (dkt. no. 82), while the plaintiff's response contains only forty-three paragraphs (dkt. no. 107). (Nor do the paragraph numbers correspond to the number of the medical defendants' proposed findings of fact; the medical defendants had thirty-two paragraphs of findings, dkt. no. 89, while the plaintiff has forty-two, dkt. no. 107). The plaintiff mentions the arm infection in his response at paragraphs 18 through 20 but does not name anyone whom he claims was deliberately indifferent to him in those paragraphs. He says only that on November 17 he "alerted the pod officer that this infection was almost to his shoulder and he was having other issues, fever, dizzy, and trouble breathing." Id. at ¶20.

At screening, the court allowed the plaintiff to proceed against "Bolton" and "Stephens" because he had identified "Bolton" as a pod officer and "Stephens" as a lieutenant, and asserted that he told "medical staff and unit

24

officers" about the infection between November 9 and November 17. The nonmedical defendants have averred that there was no "Bolton" working at the jail during that period, and that the "Bowden" who worked at the jail during that period worked on a different pod and had no contact with the plaintiff. They have averred that Steffan was not involved in and did not know about the issues with the plaintiff's infected arm. The plaintiff has not addressed, or rebutted, these assertions. That fact, alone, entitled these defendants to summary judgment.

That leaves the question of whether any of the other individual defendants—Fatoki, Blozinski, Gossage or Malcomsen—were deliberately indifferent to the plaintiff's serious medical need regarding the infection. The court did not allow the plaintiff to proceed against these defendants on this claim, but even if it had, no reasonable jury could conclude that they were deliberately indifferent to the infection.

In his complaint, the plaintiff asserted that "11/9/2016 through 11/17/16 I notified medical staff and unit officers of the severe infection in my left hand;" again, the complaint did not name the medical staff or unit officers, and did not say that the plaintiff told anyone about his arm before November 9. Dkt. No. 1 at 3.

In his proposed findings of fact, the plaintiff asserts that on November 3, he orally "alerted the Fox pod officer" that his hand was infected, because he was unable to write a request "with the inflammation in my left hand." Dkt. No.

95 at 2; Dkt. No. 107 at ¶15. He says that on November 6 and 8, he "informed the med cart nurse about [his] hand," and that she said she would forward the information to the HSU. Dkt. No. 95 at 2. The plaintiff says that on November 9, he was transferred to the Outagamie County Jail; when he returned on November 15, he filed an inmate information request the HSU stating that his hand was "getting worse and the infection [was] moving up [his] arm." Id. He say that two days later, HSU responded by reminding him that he was on antibiotics, and that HSU was aware of his situation and was monitoring it. Id. The plaintiff concludes by saying that on November 17, he alerted "the pod officer" that the infection had almost reached his shoulder and that he was having fever, dizziness and trouble breathing. Id.at 3. He says that a nurse took his vitals and called the HSU, and he was transferred to the hospital and scheduled for surgery the next morning. Id.

The plaintiff attached to his proposed findings the HSU Inmate Request for Medical Care form he filled out on November 15. Dkt. No. 95-1 at 8. The form states that "medical staff and the unit officers" looked at his arm and said it looked very bad. Id. But the plaintiff did not identify the medical staff or unit officers who looked at his arm or indicate when they looked at his arm. In his declaration, the plaintiff alleges that the issues with the expired insulin caused the infection in his hand. Dkt. No. 108 at ¶¶7-8.

There is nothing in the record evidence to support the plaintiff's claims that he told anyone at the jail about the infection prior to his transfer to

Outagamie County on November 9, 2016. The medical records indicate that the plaintiff met with Fatoki on November 3, complaining about foot pain and neuropathy, as well as continued infections on his skin. Dkt. No. 88-24 at 2. Although there is mention of "scaly papules" on his hands, there is no indication of a hand infection. Id. (A papule is "a solid or cystic raised spot on the skin that is less than 1 centimeter (cm) wide. It is a type of skin lesion." https://medlineplus.gov/ency/article/003233.htm (last visited August 21, 2019)). Fatoki believed the lesions on the plaintiff's skin were caused by dishydrotic eczema, for which he prescribed hydrocortisone cream. Id.

Records from Aurora Bay Care Hospital show that two weeks later, on November 17, the plaintiff told the physician's assistant that "his symptoms began for [sic] 5 days ago," dkt. no. 81-2; that would have been November 12, three days *after* he was transferred to the Outagamie County Jail. Records from the Outagamie County Jail indicate that the plaintiff did not seek medical attention until November 14, when he complained of a "wound in his left hand with drainage that he noticed yesterday." Dkt. No. 81-1. Finally, the defendants point out that the plaintiff himself suggested that the "wound" was the result of an event that occurred at the Outagamie County Jail. Dkt. No. 82 at ¶¶10-12. The defendants submitted the affidavit of Brooke Hallett (not a defendant), who had been employed at the jail for three years as of the date of her affidavit. Dkt. No. 78. Hallett averred that around 5:00 p.m. on November 16, she called the plaintiff out of the dayroom to test his blood sugar. Id. at ¶2. She says she

27

asked the plaintiff about his swollen hand "and whether he had punched anything." Id. Hallett says that the plaintiff responded, "Not a something." Id. Hallett says she asked the plaintiff whether he meant he hit a person, and the plaintiff responded that he "was just at Outagamie County jail and that he did not want to say 'shit' about that happened there." Id. Hallett avers that she recorded this in the jail computer system, and she reproduced the computer system entry in her declaration. Id. at ¶3.

Because there is no evidence in the record that the plaintiff told anyone at the jail about a hand infection *before* he went to the Outagamie County Jail (and no evidence in the record that he had such an infection before he went to Outagamie County), the last question is whether a reasonable jury could find that any of the defendants were deliberately indifferent to his hand infection once he returned to the jail on November 15. The evidence shows that that evening, after returning to the jail, the plaintiff saw Denissen, who reported that his hand was "very swollen and hot" and noted that he had started Bactrim, an oral antibiotic, the day before. Dkt. No. 81-5. Denissen wrote in the progress notes that "[p]atient is very adamant that he needs to see jail MD this week. Pt give[n] 2 icepacks for hand. Will continue to monitor." Id. As part of the transfer back to the Brown County Jail, staff at Outagamie County Jail had filled out a health transfer summary form indicating "left hand redness, swelling and drainage – on Bactrim." Dkt. No. 81-4. Denissen signed and acknowledged this form on November 16. Id.

28

The Brown County Jail progress notes show that at 6:05 p.m. on November 17, the plaintiff saw Larson, who indicated that the plaintiff's hand was warm to the touch, swollen, and had red streaks extending up his arm. Dkt. No. 81-6. She also noted the plaintiff's reports of "flu like symptoms and trouble breathing," as well as "needle like pain and pressure to the left chest." Id. Larson noted, "MD contacted and informed writer to send patient to ER." Id. An incident report from the Brown County Sheriff's Department indicates that at 6:30 p.m. on November 17—twenty-five minutes after the plaintiff saw Larson—the HSU staff informed the shift commander that the plaintiff needed to go to the hospital. Dkt. No. 80-2 at 2. The shift commander arranged for transport, and by 9:30 p.m. the plaintiff was being admitted to Aurora Hospital for treatment. Id.

The plaintiff did not sue Denissen or Larson. Nothing in the record suggests that Blozinski, Fatoki, Gossage or Malcomsen were aware of the infection in the plaintiff's hand between his return from Outagamie County on November 15 and his trip to the hospital on November 17. Larson said that she informed "MD" of the infection and that the "MD" directed her to send the plaintiff to the emergency room; there is no way to know whether that "MD" was Fatoki. Even if it was, there is no evidence that the MD knew anything about the infection until Larson notified him/her, and the MD's immediate response was that Larson should get the plaintiff to the ER. Within three hours, that's where the plaintiff was.

There is no evidence that any of the named individual defendants had any personal involvement with the treatment of the plaintiff's hand infection between November 15 and 17. "For a defendant to be liable under section 1983, she must be personally responsible for the alleged deprivation of the plaintiff's constitutional rights." Mitchell v. Kallas, 895 F.3d 492, 498 (7th Cir. 2018). The defendants are entitled to summary judgment for that reason.

Even if the evidence indicated that the individual defendants were personally involved in the plaintiff's treatment, there is no evidence that the treatment he received in the two days after he returned from Outagamie County Jail was so substandard as to constitute an Eighth Amendment violation. The evening the plaintiff returned to Brown County Jail, Nurse Denissen saw him; HSU staff was monitoring the situation, aware of his infection and continuing the antibiotic prescribed at Outagamie County Jail. On November 17, just two days after he returned, Larson realized that the infection was serious and contacted the "MD," who told her to send the plaintiff to the emergency room right away. The staff at Brown County Jail did not ignore the plaintiff's complaints. They did refuse to treat him. They monitored the infection, continued to treat it with antibiotics, and when it became clear that the infection was getting worse, promptly got him to a hospital. Even if this wasn't the right course of action, "medical malpractice in the form of an incorrect diagnosis or improper treatment does not state an Eighth Amendment claim." Gutierrez v. Peters, 111 F.3d 1364, 1374 (7th Cir. 1997). "mere

30

negligence or even gross negligence does not constitute deliberate indifference."
Johnson v. Doughty, 433 F.3d 1001, 1018 n.6 (7th Cir. 2006) (quoting Snipes
v. DeTella, 95 F.3d 586, 591 (7th Cir. 1996)).

Finally, no reasonable jury could find in the plaintiff's favor on an official
capacity claim. As the court noted above, a plaintiff trying to demonstrate an
official capacity claim must show a widespread practice that is so permanent
and well-settled that it constitutes a custom or practice. Estate of Sims *ex rel*
Sims, 506 F.3d at 515. The plaintiff has not alleged a practice or a custom; he
has alleged one incident where he claims individual defendants were
deliberately indifferent to his serious medical need, and the evidence does not
support that claim.

The court will grant the defendants' motions for summary judgment as to
the plaintiff's hand infection.

D.      The Plaintiff's Claims Regarding Other Skin Issues

The complaint alleged that since March of 2016, the plaintiff had
experienced "multiple flare ups of boils, sores and infections" all over his body.
Dkt. No. 1 at 3. He alleged that he'd made "multiple requests" for medical care,
but that staff did not examine him until "3-4 weeks later." Id. He alleged that
he was showing signs of staff infection or MRSA, and that Fatoki "refused to
diagnose or test." Id. He concluded by asserting that "[t]hese infections are
putting me at risk with my diabetes." Id.

Courts have questioned whether some of the conditions the plaintiff complains of constitute serious medical needs. The Seventh Circuit has said that a serious medical need is "a condition that has been diagnosed by a doctor as requiring treatment or one that is so obvious that even a lay person would perceive the need for medical treatment." Williams v. Guzman, 346 Fed. App'x 102, 105 (7th Cir. 2009) (citing Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005)). There are courts that have held that a rash, even if very itchy, is not a serious medical need. See, e.g., Holden v. Knight, No. 3:15-CV-432 JD, 2016 WL 696088, at *3 (N.D. Ind. Feb. 22, 2016) (collecting cases) ("it does not appear as though [plaintiff]'s skin rash, which is allegedly itchy and has 'hot spots,' can be considered an objectively serious medical condition. Typically, without more, skin rashes are not."); Robinson v. Milwaukee Secure Det. Facility, No. 15-C-263, 2016 WL 3620770, at *2 (E.D. Wis. June 29, 2016) (itch caused by bedbugs, treated with cream, not a serious medical condition); Smith v. Schwartz, No. 10-721-GPM, 2011 WL 2115831 (S.D. Ill. 2011) (collecting cases) (complaints of itching, athlete's foot, chafing, peeling skin and painful, infected rash do not constitute serious medical condition); Sledge v. Kooi, 56 F.3d 105, 108 (2d Cir. 2009) (eczema not a serious medical need).

Even if the court assumes, however, that the rash, boils and abscesses were serious medical needs, the plaintiff himself admits that he received treatment. In his proposed findings of fact, the plaintiff recounts the various skin issues—the itchy rash, the problems with his blanket, the lump on his

torso with discharge, the abscess on his neck—he suffered between March 21, 2016 and September 9, 2016. Dkt. No. 95 at 1-2. The plaintiff states, however, that he was treated for scabies, that Fatoki incised and drained one lump, that he was treated for scabies again, that he was treated for the abscess on his neck, he was treated a third time for scabies. Id. His main complaints seem to be that when he asked for new blankets, clothes and towels, he didn't receive them, and that he filed an inmate request asking for a diagnosis for the cause of the various lumps on his skin and that Fatoki "would not answer." Id.

The record evidence shows that Blozinski and Fatoki treated the plaintiff's various conditions with antibiotics, topical treatments for eczema, anti-parasite medication and by draining an abscess. Dkt. No. 88-2 at 2; Dkt. No. 88-6 at 2; Dkt. No. 88-14 at 2-3. Although the plaintiff complains that he was not given new bedding,[3] and that he was unable to wash his blankets, the defendants indicate that Fatoki found no evidence that the plaintiff had a wool allergy. Dkt. No. 89 at ¶8. And failure to provide an inmate with new blankets and towels does not constitute deliberate indifference to serious medical need.

The plaintiff does not agree that the treatment he received was appropriate. "'[B]ut a "mere disagreement with the court of [an inmate's] medical treatment [does not constitute] an Eighth Amendment claim of

_____

[3] Blozinski says that when she saw the plaintiff on March 24, 2016, she "requested" that he "be given a new uniform, towel and blankets." Dkt. No. 88 at ¶5.

deliberate indifference.""" <u>Snipes</u>, 95 F.3d at 591 (quoting <u>Warren v. Fanning</u>,

950 F.2d 1370, 1373 (8th Cir. 1991)). And even if Blozinski and Fatoki erred in

the treatments they provided, the court has noted that neither malpractice nor

negligence constitute deliberate indifference.

To the extent that the court allowed the plaintiff to pursue official

capacity claims, there is no evidence in the record that the defendants had a

widespread policy or custom of being deliberately indifferent to the plaintiff or

to others like him. The plaintiff was not ignored. He received treatment. If

anything, the medical records and the plaintiff's own statements show that the

defendants had a practice of responding to his medical needs.

The court will grant the defendants' motions for summary judgment as to

the plaintiff's complaints of other skin issues.

E.      <u>Supervisory Liability</u>

Finally, in the plaintiff's declaration in opposition to the nonmedical

defendants' motion for summary judgment, the plaintiff asserted that while he

was at the jail, "he was under the care of [Sheriff] John Gossage and

Administrator Larry Malcomsen." Dkt. No. 108 at ¶4. He appears to believe

that Gossage and Malcomsen were responsible for any deliberate indifference

on the part of anyone who worked at the jail. The court already has found that

none of the named defendants were deliberately indifferent. Even if they had

been, however, Gossage and Malcomsen would not have been liable just

because they were in supervisory positions. "In order for a supervisor to be

liable [under §1983], they must be 'personally responsible for the deprivation of the constitutional right.'" <u>Matthews v. City of E. St. Louis</u>, 675 F.3d 703, 708 (7th Cir. 2012) (quoting <u>Chavez v. Ill. State Police</u>, 251 F.3d 612, 651 (7th Cir. 2001)). "To show personal involvement, the supervisor must 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'" <u>Id.</u> (quoting <u>Jones v. City of Chi.</u>, 856 F.2d 985, 992-93 (7th Cir. 1988)). There is no evidence in the record that Gossage or Malcomsen were personally responsible for any of the events the plaintiff has described.

## III.    CONCLUSION

The court **GRANTS** the nonmedical defendants' motion for summary judgment. Dkt. No. 73.

The court **GRANTS** the medical defendants' motion for summary judgment. Dkt. No. 86.

The court **ORDERS** that the case is **DISMISSED**.

The court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. <u>See</u> Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. <u>See</u> Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 12th day of September, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**